IDK, INC., a Nevada Corporation; Showgirls of Las Vegas, Inc., a Nevada corporation; Golden Girls, a Nevada corporation; Playgirls, a sole proprietorship; Swinging Suzy's Escorts, Inc., a Nevada corporation; Executive Escorts, a sole proprietorship; Velvet Touch, a sole proprietorship; Escort Hotline, a sole proprietorship; Vegas Hotline, a sole proprietorship; Nevada Hotline, a sole proprietorship; Vegas Girls, a sole proprietorship; and AA-Las Vegas Escorts, Inc., a Nevada corporation, Plaintiffs,

v.

COUNTY OF CLARK, Thalia M. Dondero, Manuel J. Cortez, Karen Hayes, Paul May, R.J. "Dick" Ronzone, Donald M. Clark and Bruce L. Woodbury, in their capacity as members of the Clark County Liquor and Gaming Licensing Board; John Moran, in his capacity as Sheriff of Clark County, Nevada, and in his capacity as Chairman of the Las Vegas Metropolitan Police Commission, and as Chief Administrative Officer and Chief Law Enforcement Officer of the Las Vegas Metropolitan Police Department; Ned B. Solomon, in his capacity as Acting Director of the Clark County Department of Business License, Does I through XX, inclusive, Defendants.

No. CV-LV-84-574 RDF.

United States District Court,
D. Nevada.

Dec. 24, 1984.

David Z. Chesnoff, Ltd., Las Vegas, Nev., for plaintiffs.

E. Mahlon Edwards, Deputy Dist. Atty., Clark County, and John E. Gormley, Las Vegas, Nev., for defendants.

Opinion and Order Denying Plaintiffs' Motion for Preliminary Injunction

ROGER D. FOLEY, District Judge.

Plaintiffs, various escort bureaus in Clark County, Nevada, (the Las Vegas area), bring this suit pursuant to 42 U.S.C. § 1983 seeking damages and to enjoin, temporarily and permanently, the enforcement of Clark County Code Chapter 8.32, entitled ESCORT SERVICES. This regulation subjects plaintiffs to various licensing requirements in order to lawfully operate an escort service. Plaintiffs claim the regulation is overbroad and vague; that the regulation is a prior restraint on protected First Amendment activity; and that the regulation grants excessive discretion in the

Clark County Liquor and Gaming Licensing Board.

This opinion addresses plaintiffs' motion for a preliminary injunction. Plaintiffs will prevail on the motion "by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in [plaintiffs'] favor." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). *See also Sports Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750, 753 (9th Cir.1982). However, plaintiffs have not met this burden.

The Court finds the regulation neither overbroad nor vague. And since the Court finds no First Amendment activity implicated in the escort bureau licensing scheme, the regulation is not a prior restraint. Further, the Court finds no delegation of excessive discretion. Therefore, federal interference with Clark County's licensing policies and procedures is unwarranted. No temporary or permanent equitable relief will be granted.

I. ABSTENTION

Defendants urge the Court to abstain from considering this case. Typically, a federal court will not interfere with a state's good faith civil or criminal regulatory enforcement proceedings. A state court usually will resolve any federal constitutional issues along with its resolution of the state law prosecution or civil enforcement proceeding. However, when the state proceedings will not assure adequate vindication of a litigant's constitutional rights, a federal court may enjoin those proceedings. *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22, 28 (1965).

In the present case, plaintiffs, the escort bureaus, allege they are engaged primarily in protected First Amendment activity. Furthermore, they claim the continued enforcement of Clark County Code Chapter 8.32 impermissibly violates their freedom of association. If the regulation truly inhibits plaintiffs' freedom of association, as alleged, plaintiffs may indeed suffer irreparable injury while they await a state court decision on matters pending under the regulation. Continued enforcement of the regulation may result in serious constitutional violations. The threat of sanctions against the escort bureaus and their employees may deter protected conduct as effectively as the actual application of sanctions. "The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Id.* at 486–87, 85 S.Ct. at 1120–21.

Plaintiffs' allegations suggest that the County's actual and threatened prosecutions against them and their employees has a chilling effect on protected associational conduct. If these allegations state a claim under 42 U.S.C. § 1983, as the Court believes they do, abstention is inappropriate. And assuming the allegations are correct, judicial delay in vindicating those allegedly infringed constitutional rights must be prevented. *Id.; Marshall v. Sawyer,* 301 F.2d 639, 646 (9th Cir.1962).

Abstention may still be proper if the regulation in question is open to a Nevada state court's interpretation which might avoid in whole or in part the present constitutional issues. *Id.* at 645. But the Nevada Supreme Court already has dealt with Clark County Code Chapter 8.32. *Republic Entertainment, Inc. v. Clark County,* 99 Nev.Ad.Op. 173, 672 P.2d 634 (1983). In *Republic Entertainment,* the Nevada Supreme Court resolved questions of overbreadth, vagueness and prior restraint, and found the regulation constitutional on all accounts. The scope of the regulation was not narrowed.[1]

Because the Nevada Supreme Court has already dealt with these issues, the regula-

1. In *Republic Entertainment,* 672 P.2d 634, several escort bureaus brought an action to enjoin the Clark County Liquor and Gaming Licensing Board from requiring them to obtain a license to operate and from prohibiting unlicensed services from advertising. The Nevada Supreme Court held that the regulation in question here was neither overbroad nor vague. Furthermore, the advertising restriction was not a prior

tion is "not readily subject to a narrowing construction by the state courts." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975). And since the regulation "is not fairly subject to an interpretation which will avoid or modify the federal constitutional question[s], it is the duty of [this Court] to decide the federal question[s]" now before it. *Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391, 397, 19 L.Ed.2d 444, 452 (1967). Therefore, abstention here is inappropriate.

However, the equitable and legal relief sought by plaintiffs is not necessarily mandated simply because abstention is improper. Plaintiffs still must establish that their activity is protected under the First Amendment. Therefore, the Court must determine whether the challenged regulation inhibits any of plaintiffs' First Amendment rights.

II. OVERBREADTH

a. *Standing*

Plaintiffs allege the Clark County ordinance is overbroad and, as a result, unconstitutional on its face. This court must base its determination of facial validity on any limiting constructions the Nevada courts or enforcement agencies have proffered which would narrow the permissible scope of the regulation. *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494, n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362, 369 (1982); *Adamian v. Jacobsen,* 523 F.2d 929, 932 (9th Cir.1975); *See also Sawyer v. Sandstrom,* 615 F.2d 311, 315 (5th Cir.1980). But the Nevada Supreme Court has already approved of the present language of the regulation, as amended by Regulations G–59–81 and G–66–83. *Republic Entertainment, Inc. v. Clark County,* 99 Nev.Ad.Op. 173, 672 P.2d 634 (1983).[2] The regulation's scope has not been narrowed. Therefore, this Court's determination of facial validity will be unaffected by that decision.

The nub of plaintiffs' overbreadth argument is that the conduct of plaintiffs, their hired escorts and runners,[3] is protected by what plaintiffs label "*GENERIC* first amendment rights." Further, they claim the regulation inhibits those rights. Plaintiffs' Brief at 14. Plaintiffs propose that the First Amendment freedom of association includes a paid escort's right to date, socialize, visit and accompany the paying customer. Moreover, plaintiffs claim that the escort bureaus themselves have the constitutional right to "introduce" the escort to her customer, and that the escort runners have the constitutional right to "contact" and "meet" the customer to arrange the *date. Id.*

Though plaintiffs claim a First Amendment right to "introduce" the escort and her customer, they assert primarily the rights of the escorts who are not before the

restraint in violation of the First Amendment. *Id.* at 638. As a result, the Nevada Supreme Court has not construed the regulation to exclude any particular conduct from its proscriptions.

However, the Nevada Supreme Court declared the current regulation's predecessor, Clark County Code Chapter 6.66, unconstitutional in *Eaves v. Board of Clark County Comm'rs,* 96 Nev. 921, 620 P.2d 1248 (1980). The original section 6.66.030 spoke of "... direct or indirect social companions, or 'escort' ..." which the Nevada court found vague and uncertain. The court suggested that the ordinance might improperly implicate secretaries, companions to the aged and even babysitters.

To correct the constitutional problems identified in *Eaves,* Chapter 8.32 was amended by Regulation G–59–81, and these ambiguities were removed. In the opinion of this Court, the current version of the regulation is sufficiently clear to provide adequate notice of its proscriptions. *See Papachristou v. City of Jacksonville,* 405 U.S. 156, 161, 92 S.Ct. 839, 842, 31 L.Ed.2d 110, 115 (1972).

Furthermore, plaintiffs find fault with the Licensing Board's Declaration of Policy found in section 8.32.020. However, this section no longer appears in the current version of the Clark County Code. This section was specifically repealed when Chapter 8.32 was amended by Regulation G–59–81. It appears to have been an oversight that the old section 8.32.020 was printed in the current version of the County Code.

2. *See, supra,* note 1.

3. Some escort bureaus employ "runners," usually men, who, after the bureau receives a call from a prospective customer, go to the customer's location to collect the escort fee and to make other necessary arrangements. *See also, infra* note 7.

Court. It is the escorts who supposedly "date," not the bureaus themselves. Plaintiffs, however, "are permitted to challenge [this regulation] ... because of a judicial prediction or assumption that the [regulation's] very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 840 (1973).

Plaintiffs seek equitable relief to enjoin enforcement of the ordinance because of its alleged overbreadth. Plaintiffs will prevail on the motion for preliminary injunction if they show a "realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections" of the plaintiffs themselves or of parties not before the Court. *City Council v. Taxpayers for Vincent,* — U.S. —, 80 L.Ed.2d 772, 784, 104 S.Ct. 2118 (1984). As shall be seen, however, plaintiffs fail to carry this burden.

■ Under the overbreadth doctrine, "a law is void on its face if it sweeps within its ambit not solely activity that is subject to governmental control, but also includes within its prohibition the practice of a protected constitutional right." *Clark v. City of Los Angeles,* 650 F.2d 1033, 1039 (9th Cir.1981). *See also, Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965). However, the overbreadth still must be both real and substantial and, the constitutional flaw, if any, must be a "substantial concern in the context of the [regulation] as a whole." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2917.

The Court's first duty then is to determine if the regulation intrudes on any First Amendment rights. Second, if First Amendment rights are implicated in the escort bureau licensing scheme, the Court must determine if the intrusion is substantial. If so, injunctive relief will be appropriate.

b. *Intrusion on First Amendment Rights*

Plaintiffs argument has the following premises: first, a professional escort and her customer are involved in an ordinary dating relationship; second, the dating relationship is protected under the First Amendment; and third, that the professional escort and/or escort service are compensated for personal services rendered is irrelevant. Therefore, argue plaintiffs, an escort, her customer, and anyone else who helps consummate the commercial transaction, are engaged in protected, associational conduct.

Though well constructed, plaintiffs' argument is flawed. Their first and third premises and conclusion are faulty. Most importantly, the Court disagrees with plaintiffs suggestion that the alleged associational activity must be accorded the same degree of judicial protection as that given to the press.

Plaintiffs' contention that escort services promote mere dating is incredible. If dating truly is a part of an escort bureau environment, it is minimal and purely incidental to it. An escort bureau is a business. Money is its guiding light.[4] Unlike traditional dating, love and affection are far from paramount in its scheme of priori-

4. In the deposition of undercover Las Vegas police officer, Gary Marsh, who worked as a runner for an escort service, the following dialogue occurred:

Q. Let me ask you this? We tend to use the word tip as almost an asterisk to something. How much is the fee? The alleged escort fee is how much?

A. The fee that I was told to charge was $55 an hour, $75 for two hours, $105 for three hours and as much as you could get for anything else. Anything above.

Q. But, how much was the tip?

A. The tip was whatever the girl could get.

Q. Generally, what would that have been?

A. The girls that I talked to started at $200 and down depending upon for what type of sex. It wasn't uncommon for the girls to say they wouldn't do anything other than manipulation for under fifty.

Q. So, essentially what you would call the tip was more expensive to the customer than the alleged real service?

A. No question about it.

Q. Okay.

A. But, part of the tip, of course, came back to the company.

Q. Now, the fee, this fifty-five dollars, goes to the businessman himself? And the tip is split or is everything split?

ties. And like any other capitalistic venture, an escort bureau succeeds or fails on the basis of supply and demand. A glance at the escort bureau advertising on the streets and in the telephone directory, indicates a strong demand for their services and wares.

Plaintiffs allege that the ordinance endangers the First Amendment rights of the escorts, the runners and the escort bureaus themselves. To buttress their position, plaintiffs rely primarily on *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984), which held that the dating relationship is a protected First Amendment freedom.[5] There, Wilson, a police officer, was fired for disobeying his superiors' orders to stop dating the daughter of a well-known, convicted, organized crime figure. Following his dismissal, Wilson brought a civil action against the city's Civil Service Board and its chairman under 42 U.S.C. § 1983. Wilson claimed his First Amendment freedoms of association had been violated. The court agreed, holding that "freedom of association applies not only to situations where an advancing of common beliefs occurs, but also to purely social and personal associations." *Id.* at 1544.

The *Wilson* opinion is not on point. Associational rights under the First Amendment ought to include the right to date whomever one chooses. However, the young women and men who work for Las Vegas escort bureaus are not involved in simple dating relationships. Any assertion to the contrary is incorrect. The escort bureaus, their employees, and the contracting customers are parties to a business venture outside the scope of a "purely social and personal association." *Id.*[6]

*Wilson* did not involve dating in a commercial context. However, a California case, *People v. Katrinak,* 136 Cal.App.3d 145, 185 Cal.Rptr. 869 (Cal.Ct.App.1982), is directly on point. In *Katrinak* the constitutionality of the Los Angeles County Ordi-

A. The fifty-five, or the original fee, goes back to the company. And the boss says he pays for his lawyers and things out of that. The tip money is brought back, and there is a schedule, at least in our situation, where the girl would have to give between 25 and 50 percent back to the company. And they would have to put that in a separate drawer for the boss.

Q. Was it all a cash business?

A. We would accept Visa, Mastercharge and cash, of course. Travelers' checks. On the credit card, we did have to verify it for over a certain amount of money.

. . . . .

Deposition of Gary Marsh at 21–23.

5. Two United States District Courts, outside the Eleventh Circuit, have treated almost identical fact situations. *Baron v. Meloni,* 556 F.Supp. 796 (W.D.N.Y.1983); *Jackson v. Howell,* 577 F.Supp. 47 (W.D.Mich.1983). In both cases, like *Wilson v. Taylor, supra,* a policeman was fired for dating or associating with women unacceptable to the local police authorities. Both courts, however, held that the policeman's dating relationship was not protected under the associational freedoms.

6. Another undercover police officer, Brenda Parker, worked as the telephone receptionist for two escort bureaus. Her deposition provided the following:

Q. Now, in your experience, in your undercover work, were there any times where anybody called in or solicited any of the companies where they just simply wanted a companion? Period.

A. I can't remember of anybody that said, gee, I just want to go out to dinner. They were very straight-forward about what they wanted. Very obvious about why they were calling and what they wanted.

. . . . .

Deposition of Brenda Parker at 10–11.

Similarly, Gary Marsh, *see supra* note 4, was asked the following question:

Q. In your experience, did anyone ever solicit your business simply based on the desire to have a companion?

A. No. Never.

. . . . .

Deposition of Gary Marsh at 19.

And the following exchange occurred in the deposition of Detective Doug Shangreaux who also worked undercover.

Q. [D]id you ever know of anybody that was a patron of an escort bureau that did it just for the purposes of having somebody go to dinner with them or anything like that? ... Companionship?

A. No. Not at all. I was asked many times by the customer what they were going to get, you know, from the girl. If the girl performed oral copulation and these types of things. So, no, I don't think anybody was ever interested in a dinner date.

....

Deposition of Doug Shangreaux at 33.

nance regulating the licensing of escort bureaus was questioned. The central issue was whether the operation of an escort bureau was a protected associational freedom under the First Amendment. Among other things, the court held that the escort service engaged primarily in the "sale of companionship," and that such "an essentially commercial relationship," was not a constitutionally protected right. *Katrinak,* 185 Cal.Rptr. at 875.

The Court disagrees with plaintiffs' assertion that the commercial aspects of the escort relationship ought not be considered here. Plaintiffs suggest it is irrelevant that the escort bureaus charge a fee or that the professional escort is paid for her personal services. Citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), plaintiffs equate the freedom of commercial association with the freedom of speech and press. Plaintiffs rely on language in *Sullivan* which states: "That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold." 376 U.S. at 266, 84 S.Ct. at 718. *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 386, 93 S.Ct. 2553, 2559, 37 L.Ed.2d 669, 677 (1973).

However, to suggest that the interests at stake here are tantamount to a traditional newspaper's interests is absurd. In *Pittsburgh Press, supra,* Justice Powell observed that the free press filled an essential role in our democracy. Furthermore, "[t]he durability of our system of self-government hinges on the preservation of these freedoms." *Id.* at 381–82, 93 S.Ct. at 2556–57. Additionally, "informed public opinion is the most potent of all restraints upon misgovernment ...." *Id. quoting Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). An escort bureau hardly restrains misgovernment. All evidence and documents before the Court leave no room for doubt that the Las Vegas escort services are no more than modified brothels.[7] Sure-

7. In Brenda Parker's deposition she was asked:

Q. And what kind of activities did girls perform or services did they render?

A. Prostitution.

Q. Was this at the insistence or advice of the owner?

A. Yes. That's what the girls were hired for. I was present for several job interviews. And that's what the women were hired for. Prostitution activities.

. . . . . . .

Deposition of Brenda Parker at 4–5.

Later in the same deposition she stated:

A. When the customer calls the phone girl, usually the first thing the man asks is how much.

The girl gives him a little run down of what are called discount prices. Then he is explained that a representative [usually called a runner] will come to his room and show him a set of pictures of young ladies who are employed by the service. He can pick out the girl he wants to meet. And then she comes over.

He agrees to this, gives his name, the room number, and the hotel he is staying at. The phone girl then verifies the fact that he is in that room and registered there and then dispatches the representative giving him the pertinent information he needs.

The representative meets with the customer, tells the customer how the service works, has him sign a little contract and the customer pays a fee depending on how much time he wants and also depending on how good looking the girl is that he has picked out.

. . . . . . .

*Id.* at 8.

That escort bureaus engaged freely in prostitution was further bolstered by Gary Marsh's deposition. He worked undercover as a runner. When asked if he had any conclusions and observations about the escort business, he offered the following:

A. ... There was no doubt that the entire escort service that I worked for was predicated on the sale of sex.

Q. Can you give ... some examples that would illustrate that conclusion?

A. Well, it wasn't unusual at all to take a girl to a date and find a customer waiting in his underwear or in bed with the covers turned back.

Part of our services specialized in what some people refer to as B & D or bondage and domination. A date might—or a guy might call up and ask for a dominant date.

We had one particular girl that carried an attache case with whips and chains and spiked high heels. And on one occasion she said don't be alarmed going into this room because this guy might look unusual.

Well, you opened the door; and he had nothing but a towel on, and he was on his knees panting like a dog.

. . . . . . .

ly, our democracy's durability depends on something other than a person's right to engage in the commercial sale of sex. Any suggestion to the contrary is preposterous.

Contrary to plaintiffs' contentions, commercial associational rights can be restricted. *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61–62, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446, 459 (1973). *See also Oueilhe v. Lovell,* 93 Nev. 111, 560 P.2d 1348, 1349 (1977). Mere association, incidental to a commercial transaction, does not mean that the parties to the transaction are necessarily involved in a protected associational relationship. For example, the Supreme Court stated that securities and antitrust laws drastically restrict associational rights. *Paris Adult Theatre, supra,* 413 U.S. at 61–62, 93 S.Ct. at 2637. Similarly, a lawyer's in-person solicitation of employment, in which associational conduct clearly is present, may be highly regulated and closely scrutinized. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456–57, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444, 453–54 (1978).

Escort bureaus should be afforded no greater associational protections than other commercial enterprises. Plaintiffs attempt to shroud this commercial relationship in the protective veneer of an ordinary dating relationship. Any semblance of a dating relationship is incidental.

Plaintiffs have failed to show a realistic danger of harm to recognized First Amendment protections. Associational freedoms under the First Amendment encompass many activities. But commercial dating in the escort bureau context and transactions incidental thereto fall outside that almost-sacred circle.

c. *Substantial Overbreadth*

Assuming *arguendo* that the regulation reaches protected First Amendment rights, plaintiffs still must show that the regulation substantially interferes with the protected conduct. In a case such as this, "where conduct and not merely speech is involved ... the overbreadth must not only be real, but substantial as well, judged in relation to the [regulation's] plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2917. *See also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310, 320 (1976). "The bare possibility of unconstitutional application is not enough; the law is unconstitutionally overbroad only if it reaches *substantially* beyond the permissible scope of legislative regulation...." *City Council v. Taxpayers for Vincent,* — U.S. —, 104 S.Ct. 2118, 80 L.Ed.2d 772, 784 n. 19 (1984), *quoting* Jeffries, *Rethinking Prior Restraint,* 92 Yale L.J. 409, 425 (1983).

Even if dating is part of the commercial escort business, it is minimal, incidental, and is at best, a subordinate component. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456–57, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444, 453–54 (1978). *See also Chase v. Davelaar,* 645 F.2d 735, 738 (9th Cir.1981).

Plaintiffs have failed to show that the regulation intrudes either on their First Amendment rights or on the rights of parties not before the Court. And even assuming some First Amendment rights are implicated in the escort bureau licensing scheme, no substantial intrusion has been shown. For these reasons, the facial overbreadth challenge must fail.

Deposition of Gary Marsh at 16–17.

Finally, vice officer Robert Gillespie who had been involved in a number of escort bureau investigations stated:

A. I'd say that any escort business that I have dealt with since I have been a vice officer has totally based their business around prostitution and accepting money under false pretenses, such as fraud.

Q. And this includes all the licensed escort bureaus—

A. Yes.

Q. (continuing)—in Clark County?

A. Yes, it does.

. . . . .

Deposition of Robert Gillespie at 26.

III. VAGUENESS

Plaintiffs also claim the regulation is unconstitutionally vague on its face. Since this case

> implicates no constitutionally protected conduct, [this Court] should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the law as applied to the conduct of others. [This] court should therefore examine the [escort bureaus'] conduct before analyzing other hypothetical applications of the law.

*Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494–95, 1191, 71 L.Ed.2d 362, 369 (1982).

Clark County Regulation 8.32 will be held unconstitutionally vague as applied to plaintiffs if a person of ordinary intelligence would have to guess whether his conduct is proscribed by the regulation. *Broadrick,* 413 U.S. at 607, 93 S.Ct. at 2913.

Plaintiffs' vagueness challenge centers on the language of the regulation and on the regulation's enforcement guidelines. In the licensing scheme, a license may be revoked or denied for numerous reasons including the Licensing Board's determination that an escort bureau is sexually oriented. Sexual orientation is determined by a number of factors. Among other things, if the escort bureau advertises either the availability of sexual stimulation or sexual gratification, or that the bureau will provide escorts who will sexually stimulate or gratify a patron, then the bureau is sexually oriented.[8]

8. Much of the controversy centers on the definition of "sexually oriented escort bureaus," which is set forth in Section 8.32.060(B)(2). The regulation provides a number of reasons why an escort license may be revoked or denied upon application. That a particular escort service is sexually oriented is one reason why the license may be revoked or denied. *See* 8.32.080(J)(5).

> 8.32.060(B)(2) A sexually oriented escort bureau is an escort bureau which:
>
> (a) Operates in any of the manners described in Section 8.32.010(C)(a), (b), (e), (*o*); or
>
> (b) Does not maintain an open office; or
>
> (c) Uses an escort bureau runner or contracts with third persons for the referral of patrons; or
>
> (d) Advertises, either directly or by implication that sexual stimulation or sexual gratification will be provided, or that escorts which provide such sexual stimulation or sexual gratification will be provided or introduced to a patron; or
>
> (e) Provides sexual stimulation or sexual gratification to an escort patron; or
>
> (f) Employs, contracts with or provides escorts which do not possess work identification cards.

Subsection (a) incorporates by reference Section 8.32.010(C)(a), (b), (e), and (*o*). These subsections, however, include only some of the findings of the Clark County board of commissioners regarding the operation of escort services. The complete findings read as follows:

> 8.32.010(C) Based upon the above, the Clark County liquor and gaming licensing board determines that the operation of a business of providing escorts (as herein defined) is detrimental to the health and safety of the public, community, and tourists, that such a business is offensive to the public morals and decency; that such a business is detrimental to the continued economic development of the county and tends to degrade the county as a provider of good entertainment, and is harmful to the cause of attracting tourists, visitors, and conventions to the county; it having been established that the escorts and escort bureaus have:
>
> (a) Engaged in fraudulent, misleading and deceptive advertising which is designed to make the prospective client believe that acts of prostitution ... will be provided;
>
> (b) Collected money in advance for the promise of acts of prostitution and refused to provide same unless additional money is paid to the escort as a tip, toke or gratuity;
>
> (c) Forced other escort services out of business by threats and by intimidation have taken over other escort bureaus;
>
> (d) Failed, neglected and refused to comply with legitimate ordinances requiring weekly health examinations for infectious disease, resulting in a higher incidence of infectious contagious disease than that of licensed Nevada brothels;
>
> (e) Used as escorts, persons known to have violated the law regarding prostitution, and refuse to cease their use;
>
> (f) Required escorts to pay the escort bureau as much as five hundred fifty dollars per week for introductions to patrons;
>
> (g) Operated primarily as an employment agency without acquiring a state license therefor or complying with state law, as required in NRS Chapter 611;
>
> (h) Employed "escorts" without providing Nevada Industrial Insurance of employment security benefits therefor;

Plaintiffs claim that the terms "sexual stimulation" and "sexual gratification" are too vague. "Sexual gratification" is clearly defined by the regulation, while "sexual stimulation" is not. Section 8.32.060(I) defines "sexual gratification" by cross-referencing Nevada Revised Statutes 201.295 which provides:

1. "Prostitute" means a male or female person who for a fee engages in sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person.

2. "Sexual conduct" means any of the acts enumerated in subsection 1.

Nev.Rev.Stat. § 201.295 (1979).

Clearly, the term "sexual gratification" is not vague as applied to plaintiffs. A reasonable person in the shoes of an escort or escort bureau operator is adequately notified of what conduct is contemplated by the term "sexual gratification."

The term "sexual stimulation" is indeed vague *outside* the context of escort bureau regulation. However, no meaning of the term is incompatible with plaintiffs' conduct. Whatever "sexual stimulation" means, a person of ordinary intelligence needs not guess that plaintiffs, their employees, and other escort bureaus engage in sexually stimulating advertising and conduct. The explicit licensing requirements of the remainder of the regulation overcome any ambiguity surrounding the term "sexual stimulation." It is only one of many factors to consider to determine that an escort bureau is sexually oriented. If "sexual stimulation" alone were dispositive of such a determination, plaintiffs' vagueness attack would be justified.

In spite of any ambiguity in the term "sexual stimulation," the plaintiffs, as escort bureaus, *clearly* know what they must do, or must not do, to comply with the regulation. As applied to plaintiffs, the licensing requirements are clearly stated. A reasonable person, in the shoes of an escort bureau operator, needs not guess at what conduct is proscribed. *See Broadrick,* 413 U.S. at 612, 93 S.Ct. at 2915. The Court cannot say that the regulation is therefore impermissibly vague as applied to plaintiffs. Since the regulation is not impermissibly vague in *all* of its applications, plaintiffs' facial vagueness challenge on this point must fail. *See Flipside,* 455 U.S. at 494–95, 102 S.Ct. at 1191. *See also, Papachristou v. City of Jacksonville,* 405 U.S. 156, 161, 842, 31 L.Ed.2d 110, 115 (1972).

IV. GRANT OF EXCESSIVE DISCRETION

Plaintiffs challenge the regulation claiming that the Licensing Board is granted excessive discretion and that such discretion denies substantive due process. For due process to apply, there must be a protectable liberty or property interest. Such an interest "results from a legitimate claim of entitlement created and defined by

(i) Defrauded patrons by sending escorts other than those for which contract was made;

(j) Refused to refund fees paid by patrons upon a patron's complaint of failure to satisfy contractual agreement;

(k) Submitted fraudulent and incomplete financial records for the purpose of computing license tax;

(*l*) Operated unlicensed escort bureaus and violated valid court orders;

(m) Refused to protect escorts sent out by them resulting in the rape, assault and robbery thereof;

(n) Given Las Vegas and Clark County the reputation of the "Prostitution Capitol of the World";

(*o*) Operated escort bureaus as a "call girl" prostitution operation;

(p) Operated only on an "out call" basis;

(q) Admitted in judicial proceedings they are unable to control the acts of the escort to prevent acts of prostitution while with a patron;

(r) Admitted in judicial proceedings that the business relationship between an escort and an escort patron was the "private sex life of an individual";

(s) Admitted in judicial proceedings their business is of the nature of a dancehall and within the jurisdiction of the license board rather than the board of county commissioners. Thus, admitting the escort bureaus to be a privileged business;

(t) Defined "escort bureau" in judicial proceedings as "a business which furnished persons who make a business or profession of being a date or companion to another."

an independent source, such as state or federal law." *Russell v. Landrieu,* 621 F.2d 1037, 1040 (9th Cir.1980). *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In the instant case, Nevada has determined the extent of constitutional protection to be given to escort licenses. The Nevada legislature has declared that the operation of escort bureaus, like gaming establishments, is a privileged occupation. Nev.Rev.Stat. § 244.345 (1981); Nev.Rev. Stat. § 463.0129 paragraph 2 (1983); Clark County Code 8.32.060. As such, their licenses to operate are considered revokable privileges. The respective licensees acquire no vested rights in the licenses.

The Ninth Circuit Court of Appeals and the Nevada Supreme Court have treated and resolved the discretion argument in the context of privileged businesses. *Jacobson v. Hannifin,* 627 F.2d 177 (9th Cir.1980); *State v. Rosenthal,* 93 Nev. 36, 559 P.2d 830 (1977). In *Jacobson, supra,* the plaintiff previously had been licensed to operate a casino. The license expired and, following financial difficulties, he unsuccessfully reapplied for a new license. He sued under 42 U.S.C. §§ 1983 and 1985, claiming the Nevada Gaming Commission, among others, had conspired to deprive him of his license in violation of the due process clause of the United States Constitution. However, the court held that the property interest in the gaming license was "not so fundamental as to warrant constitutional protection apart from its status under state law." 627 F.2d at 180. And his due process claim failed.

The expectation of entitlement in an escort bureau license should be no greater than that found in a gaming license. Nevada has determined that the operation of an escort bureau, like gaming, is a privilege, not a right. Clark County Code 8.32.060. Escort bureaus have no vested rights in their operating licenses. The state, through its police power, may regulate the escort industry "without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure." *Rosenthal, supra,* 559 P.2d at 833, *quoting State ex rel. Grimes v. Board,* 53 Nev. 364, 372–73, 1 P.2d 570, 572 (1931). *See also Dunn v. Tax Comm'n,* 67 Nev. 173, 187, 216 P.2d 985, 990–93 (1950).

Pursuant to its police power, the Nevada legislature has vested wide discretion in the Licensing Board to regulate escort services. Under its police power, Nevada and Clark County may regulate any business to protect the public health, morals and welfare. Clark County has a strong interest in controlling prostitution, which traditionally has been associated with escort bureaus. Unbridled prostitution spreads disease of the body and mind. Both the youth and the adult communities are vulnerable to its debilitating influences. *See People v. Katrinak,* 136 Cal.App.3d 155, 185 Cal. Rptr. 869, 875 (Cal.Ct.App.1982). Because the escort industry historically has been so closely associated with prostitution, the Court believes escort bureaus are particularly suited to strict regulation under the local police power.

However, the police power is not a *carte blanche* for the local governments; it must be tempered by due process. *See Jacobson, supra,* 627 F.2d at 179–80. However, in this context substantive due process "demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be attained." *Nebbia v. New York,* 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 940 (1934). *See also Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 84–85, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741, 754 (1980); *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, 99 (1978). As long as Clark County Code Chapter 8.32 meets this standard, it will be upheld even though it may affect incidentally the exercise of protected rights.

Plaintiffs claim that the licensing standards grant more discretion to the Licensing Board than is constitutionally permissi-

ble. They claim that the escort licensing standards are unreasonable and arbitrary. However, a comparison of the standards challenged here with the statutory gaming standards approved by the Ninth Circuit, *Jacobson*, 627 F.2d 177, and by the Nevada Supreme Court, *Rosenthal*, 559 P.2d 830, shows striking similarity between the two enactments. The gaming regulations require that the license

> not be granted unless the commission is *satisfied* that the applicant is ... *a person of good character, honesty and integrity;* whose prior *activities* ... *reputation, habits* and *associations* do not *pose a threat* to the public interest ... or to the *effective* regulation and control of gaming, or *create* or *enhance* the *dangers of unsuitable, unfair or illegal practices,* methods and activities in the conduct of gaming ... business; and [who is *in* ] *all other respects qualified* to be licensed or found suitable *consistently with the declared policy of the state.*

Nev.Rev.Stat. § 463.170 paragraph 2 (1979) (emphasis added).

Furthermore the state shall deny the license if "[t]he proposed financing of the ... operation is [not] ... *[f]rom a suitable source.* Any lender or other source of money or credit which the commission finds does not meet the standards set forth [above] may be *deemed* unsuitable." Nev. Rev.Stat. § 463.170 paragraph 3 (1979) (emphasis added). Additionally, the gaming statutes grant to the Gaming Commission "full and absolute power and authority to deny any application *for any cause it deems reasonable.*" Nev.Rev.Stat. § 463.-220(7) (1983) (emphasis added). In fact, *reasonableness* is the "only substantive restriction imposed upon the Commission's exercise of authority ...." *Jacobson,* 627 F.2d at 179, *citing State v. Rosenthal,* 559 P.2d 830 (Nev.1977) (emphasis added). *See also Nevada Tax Comm'n v. Hicks,* 73 Nev. 115, 310 P.2d 852 (1957).

This language from the Nevada gaming statutes, *supra,* is virtually identical to the language plaintiffs find objectionable in the Clark County escort services regulation. *See* Plaintiffs' Brief at 27–28. However, the Nevada Supreme Court and the Ninth Circuit approved of this language, even though it conferred very broad discretion on the Nevada Gaming Commission. *See Jacobson,* 627 F.2d 177; *Rosenthal,* 559 P.2d 830. Like the Nevada Gaming Commission, the Clark County Liquor and Gaming Licensing Board has been given wide discretion to license and regulate escort services. This Court finds such discretion unobjectionable. *See Sunset Amusement Co. v. Board of Police Comm'rs of Los Angeles,* 7 Cal.3d 64, 101 Cal.Rptr. 768, 496 P.2d 840 (1972).

The regulation in question here is constitutional. It has a real and substantial relation to the county's interest in protecting the health, welfare and morals of the community. It attempts to prevent, or at least hinder, organized prostitution in the guise of escort services. As such, it promotes the general welfare of the community. Like the Nevada gaming statutes, its licensing standards are neither arbitrary nor capricious. Furthermore, the discretion granted to the Clark County Liquor and Gaming Licensing Board is reasonable. *See Jacobson,* 627 F.2d 177; *Rosenthal,* 559 P.2d 830. The police power is unabused and the constitution unoffended. *See Nebbia v. New York, supra,* 291 U.S. at 525. *See also Patch Enterprises, Inc. v. McCall,* 447 F.Supp. 1075, 1079–80 (M.D. Fla.1978).

CONCLUSION

Therefore, plaintiffs' motion for preliminary injunction is denied.

IT IS SO ORDERED.