836 F.2d 1185
 56 USLW 2393
 IDK, INC., a Nevada corporation; Showgirls of Las Vegas,
Inc., a Nevada corporation; Golden Girls, a
Nevada corporation; Playgirls, a sole
proprietorship; et al.,
Plaintiffs-Appellants,
v.
COUNTY OF CLARK; Thalia M. Dondero, Manuel J. Cortez, Karen
Hayes, Paul May, R.J. "Dick" Ronzone, Donald M. Clark and
Bruce L. Woodbury, in their capacity as members of the Clark
County Liquor and Gaming Licensing Board; et al.,
Defendants-Appellees.
 No. 85-1877.
 United States Court of Appeals,
Ninth Circuit.
 Argued Oct. 1, 1986.
Submitted Nov. 4, 1986.
Decided Jan. 8, 1988.
 
 Vincent Savarese, III, Savarese & Chesnoff, Ltd., Las Vegas, Nev., for plaintiffs-appellees.
 S. Mahlon Edwards, Deputy Dist. Atty., Las Vegas, Nev., for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before ALARCON, BOOCHEVER and REINHARDT, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 IDK, Inc., and other escort services located in the County of Clark appeal the district court's entry of summary judgment that the county's regulation concerning licensing and control of escort services and their employees is constitutional on its face. They contend the regulation violates the first and fourteenth amendments to the Constitution and seek a declaration that the regulation is unconstitutional, a permanent injunction against its enforcement, compensatory and punitive damages, and attorneys' fees. We affirm. The regulation is facially constitutional because it does not reach a substantial amount of constitutionally protected activity and is not vague in all possible applications.
 
 FACTS
 
 2
 Escort services provide their clientele with companions for a fee. The county has tried several times to control their operation. It contends that most if not all escort services are little more than "modified brothels." In a previous attempt, the county prohibited working as a paid social companion or escort or operating an escort bureau as a business. The Supreme Court of Nevada held that the definitions of "social companion" and "escort" were unconstitutionally vague. Eaves v. Board of Clark County Comm'rs, 96 Nev. 921, 620 P.2d 1248 (1980). The definitions of these terms did not provide fair notice of the activities prohibited by the statute: social secretaries, babysitters, and companions for the aged and infirm could only guess whether they were guilty of impermissible conduct. Id. at 924, 620 P.2d at 1250.
 
 
 3
 The county then enacted the regulation at issue here and has since amended it twice. On appeal, we review the regulation in its present form. Bradley v. School Bd., 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); Thorpe v. Housing Auth., 393 U.S. 268, 281-82, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). Subsections 40 and 50 of Chapter 8.32 in Title 8 of the Clark County Code (CCC) make it unlawful to operate an escort service or work as an escort without a license from the county. The regulation defines "escort" and "escort bureau" and distinguishes between "service oriented" and "sexually oriented" escorts and escort bureaus. CCC Sec. 8.32.060(A)-(B).[1] Sexually oriented escort bureaus may not receive licenses and escort bureaus that operate in a sexually oriented manner may have their licenses revoked. CCC Secs. 8.32.080(J), 8.32.140(d). Advertising that suggests escorts will provide "sexual stimulation" or "sexual gratification" is prohibited, CCC Sec. 8.32.120; those terms are defined elsewhere in the regulation. CCC Sec. 8.32.060(Q)-(R).[2] Applicants must meet detailed criteria and comply with strict reporting requirements to qualify for a license. CCC Sec. 38.32.080(B)-(F), (I)-(J). The plaintiffs were granted licenses under the first version of the challenged regulation.
 
 
 4
 In a previous action involving different plaintiffs, the Supreme Court of Nevada found that the regulation was not unconstitutionally overbroad or vague and refused to grant a preliminary injunction against its enforcement. Republic Entertainment, Inc. v. Clark County Liquor & Gambling Licensing Bd., 99 Nev. 811, 672 P.2d 634 (1983). The district court reached the same conclusion in this case and denied IDK's request for a preliminary injunction, IDK Inc. v. County of Clark, 599 F.Supp. 1402 (D.Nev.1984), and later granted the county's motion for summary judgment denying a permanent injunction.
 
 ANALYSIS
 I. Standard of Review
 
 5
 We review the grant or denial of a motion for summary judgment de novo, applying the same standard applied by a trial court under Rule 56(c) of the Federal Rules of Civil Procedure: is there a genuine issue as to any material fact and is the moving party entitled to a judgment as a matter of law? Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). We view the evidence from the perspective most favorable to the party opposing the motion. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 
 6
 Although IDK forcefully argues that genuine issues of material fact exist, it does not tell us what they are. Our examination of the record reveals none. Summary judgment in cases involving constitutional issues is often undesirable because a court benefits from a well-developed record when deciding complex and important questions. See Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Facial challenges to statutes on first amendment grounds, however, may involve questions on which summary judgment is often appropriate. See, e.g., Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). While summary judgment may be a suitable procedure for resolving facial challenges, such a questioning of a "legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, --- U.S. ----, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).
 
 
 7
 The challenge is to the statute itself, not its application to a specific event:
 
 
 8
 Procedures for testing the constitutionality of a statute "on its face" in the manner apparently contemplated by Dombrowski [v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ], and for then enjoining all action to enforce the statute until the State can obtain court approval for a modified version, are fundamentally at odds with the function of the federal courts in our constitutional plan. The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision.... [T]he task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary. The combination of the relative remoteness of the controversy, the impact on the legislative process of the relief sought, and above all the speculative and amorphous nature of the required line-by-line analysis of detailed statutes ... ordinarily results in a kind of case that is wholly unsatisfactory for deciding constitutional questions, whichever way they might be decided.
 
 
 9
 Younger v. Harris, 401 U.S. 37, 52-53, 91 S.Ct. 746, 754-55, 27 L.Ed.2d 669 (1971) (citations omitted). These lines of Justice Black not only illustrate the legalistic nature of a facial challenge to a statute but also suggest that, even with a full trial of such cases, courts should rarely grant relief.
 
 
 10
 There is an extensive record in this dispute. We have the benefit of two decisions from the Nevada Supreme Court and the district court's detailed ruling on the preliminary injunction request. The district court held oral argument before denying that request and before granting the motion for summary judgment. The parties briefed the issues extensively both here and below. The county submitted numerous exhibits to the district court which gave the history of the regulation and the county's reasons for enacting it.
 
 
 11
 Given the absence of a genuine issue of material fact and the presence of a well-developed record, we need review only the district court's application of the law.
 
 
 12
 II. Facial Challenges under the First Amendment
 
 
 13
 In analyzing the constitutional issues raised by this appeal, it is important to recognize the nature of the challenge to the county's regulations. IDK and the other escort services who brought this action were granted licenses by the county. No party has appealed from the denial of a license nor are we confronted with an appeal from a revocation of the licenses. The case was brought as a facial challenge only, and it is in that context that we undertake our review.
 
 
 14
 Courts permit facial challenges to statutes under the first amendment because its
 
 
 15
 freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.
 
 
 16
 NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) (citations omitted). Because of the chilling effect a statute might have on the freedoms of expression and association, an expedited determination of its constitutionality is preferable. "If the rule were otherwise, the contours of regulation would have to be hammered out case by case--and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965). The very existence of the regulation threatens the less hardy, inhibiting their discussions and associations. Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). Justice Marshall likened the threat to a sword of Damocles and noted that the value of such a sword "is that it hangs--not that it drops." Arnett v. Kennedy, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting).
 
 
 17
 Courts should not, however, countenance facial challenges in the ordinary course: "it can seldom be appropriate ... to exercise any such power of prior approval or veto over the legislative process." Younger, 401 U.S. at 53, 91 S.Ct. at 755. Facial invalidation is often used, however, to protect political expression and association. See, e.g., Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 490-96, 105 S.Ct. 1459, 1465-68, 84 L.Ed.2d 455 (1985); Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Dombroski, 380 U.S. 479, 85 S.Ct. 1116; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Thornhill, 310 U.S. 88, 60 S.Ct. 736.
 
 
 18
 Courts also use facial challenges to protect religious expression and association or to strike down laws that violate the first amendment's establishment clause. See, e.g., Edwards v. Aguillard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); Board of Airport Comm'rs v. Jews for Jesus, Inc., --- U.S. ----, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). If the courts of a state could adopt a construction of its statute that eliminates the constitutional defects, federal courts should defer. Time, Inc. v. Hill, 385 U.S. 374, 397, 87 S.Ct. 534, 546, 17 L.Ed.2d 456 (1967); Harrison v. NAACP, 360 U.S. 167, 176-77, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959). Partial invalidation of a statute is preferred to its wholesale invalidation. Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502, 504, 105 S.Ct. 2794, 2801, 2802, 86 L.Ed.2d 394 (1985); Buckley v. Valeo, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976). "It remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate." Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 617, 91 S.Ct. 1686, 1690, 29 L.Ed.2d 214 (1971) (Black, J., concurring in part and dissenting in part)).
 
 
 19
 A facial attack against a law's constitutionality may proceed along four axes: (1) the law may impermissibly burden the plaintiff's rights, (2) it may impermissibly burden the rights of third parties, (3) it may fail to provide adequate notice of what conduct is prohibited, or (4) it may lack sufficient guidelines to prevent arbitrary and discriminatory enforcement. See Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495-98, 102 S.Ct. 1186, 1191-93, 71 L.Ed.2d 362 (1982). The first two assail the law as a prior restraint or an invalid time, place, or manner restriction. See Shuttlesworth, 394 U.S. 147, 151-55, 89 S.Ct. 935, 938-41, 22 L.Ed.2d 162; City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-53, 106 S.Ct. 925, 928-32, 89 L.Ed.2d 29 (1986). The second additionally is an attack for overbreadth, in which the plaintiff asserts the rights of third parties. See Broadrick v. Oklahoma, 413 U.S. at 611-14, 93 S.Ct. at 2915-17. The third and fourth are challenges for vagueness. Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). The escort services assert all four as grounds for invalidating the county's regulation. Our first task is to determine whether the regulation impermissibly burdens the plaintiffs' or third parties' rights. Stated another way, does the regulation reach "a substantial amount of constitutionally protected conduct"? Flipside, 455 U.S. at 494, 102 S.Ct. at 1191.
 
 III. Dating and the Freedom of Association
 
 20
 The conduct for which the escort services claim constitutional protection is dating. The county submitted much evidence that escorts were nothing more than call girls and that the escort bureaus operated as panderers. 599 F.Supp. at 1406-08 & n. 7. Although given ample opportunity by the district court to describe the activities that their employees and clients pursue, the escort services chose to rest their facial challenge on a broad claim of a constitutional right to date, which they also refer to as a right of "interpersonal association," "silent association," and "social association."
 
 
 21
 The Constitution protects associations because of their intrinsic value as well as their value as instrumentalities for achieving certain ends:
 
 
 22
 Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.
 
 
 23
 The intrinsic and instrumental features of constitutionally protected association may, of course, coincide.
 
 
 24
 Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984); see Board of Directors of Rotary Int'l v. Rotary Club of Duarte, --- U.S. ----, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). In protecting "certain kinds of highly personal relationships," Roberts, 468 U.S. at 618, 104 S.Ct. at 3250, the Supreme Court has most often identified the source of the protection as the due process clause of the fourteenth amendment, not the first amendment's freedom to assemble. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 383-86, 98 S.Ct. 673, 679-81, 54 L.Ed.2d 618 (1978); Moore v. City of East Cleveland, 431 U.S. 494, 503-04, 97 S.Ct. 1932, 1937-38, 52 L.Ed.2d 531 (1977) (plurality opinion); Griswold v. Connecticut, 381 U.S. 479, 482-85, 85 S.Ct. 1678, 1680-82, 14 L.Ed.2d 510 (1965); see also Roberts, 468 U.S. at 619, 104 S.Ct. at 3250 (citing to other cases). The first amendment's freedom of association protects groups whose activities are explicitly stated in the amendment: speaking, worshiping, and petitioning the government. Roberts, 468 U.S. at 622-23, 104 S.Ct. at 3252. The first amendment also gives us the freedom not to assemble with those whose goals we do not share. Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 301, 106 S.Ct. 1066, 1073, 89 L.Ed.2d 232 (1986); Abood v. Detroit Bd. of Educ., 431 U.S. 209, 222, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977).
 
 
 25
 In Coates v. City of Cincinnati, the Supreme Court struck down an ordinance that made it a criminal offense for three or more persons to gather on a sidewalk and " 'conduct themselves in a manner annoying to persons passing by.' " 402 U.S. 611, 611, 91 S.Ct. 1686, 1686-87, 29 L.Ed.2d 214 (1971). The ordinance was invalid on its face because it infringed on "the right of people to gather in public places for social or political purposes." Id. at 615, 91 S.Ct. at 1689 (emphasis added). Several lower courts have held that the first amendment protects private and social associations regardless of whether they have an overtly expressive purpose. See, e.g., Sawyer v. Sandstrom, 615 F.2d 311 (5th Cir.1980) (court declared an ordinance prohibiting loitering with persons known to be using or in possession of narcotics unconstitutional on its face); McKenna v. Peekskill Housing Auth., 497 F.Supp. 1217, 1221-22 (S.D.N.Y.1980) (first amendment protects private and social associations, even those without a "hortatory purpose"), modified, 647 F.2d 332 (2d Cir.1981). The escort services rely heavily on Wilson v. Taylor, 733 F.2d 1539 (11th Cir.1984), in which the Eleventh Circuit found that the first amendment protected a policeman's right to date the daughter of a convicted felon and reputed mobster. Sawyer, McKenna, and Wilson were decided before Roberts, and one court has suggested that the right asserted by officer Wilson was the freedom of intimate association under the fourteenth amendment. Trujillo v. Board of County Comm'rs, 768 F.2d 1186, 1188-89 (10th Cir.1985). We agree. Although Wilson and his companion alleged that they discussed philosophical and social issues, the Eleventh Circuit analyzed the constitutional issue on the assumption that they were "simply dating." 733 F.2d at 1543 & n. 2.[3]
 
 
 26
 Of course, a single association may have intimate and expressive features and therefore be entitled to claim the protection of both the first and fourteenth amendments. Roberts, 468 U.S. at 618, 104 S.Ct. at 3249. If the activities of escorts and their clients qualify as intimate associations, the escort services may attack the regulation as intruding on the right of privacy. To the extent that the escort services or their employees are involved in expressive association, they may challenge the county's regulation as an impermissible burden on their first amendment rights, as overly broad, and as excessively vague.[4]
 
 A. Intimate Association
 
 27
 The relationships protected by the fourteenth amendment "are those that attend the creation and sustenance of a family" and similar "highly personal relationships." Roberts, 468 U.S. at 618-19, 104 S.Ct. at 3250. The individuals are deeply attached and committed to each other as a result of their having shared each other's thoughts, beliefs, and experiences. By the very nature of such relationships, one is involved in a relatively few intimate associations during his or her lifetime. Id. at 620, 104 S.Ct. at 3250. The factors relevant in determining whether a particular association can claim the protection of the due process clause are the group's size, its congeniality, its duration, the purposes for which it was formed, and the selectivity in choosing participants.
 
 
 28
 As a couple, an escort and client are the smallest possible association. In other regards, however, the relationship between escort and client possesses few, if any, of the aspects of an intimate association. It lasts for a short period and only as long as the client is willing to pay the fee. Although a client may have some choice as to the person he or she wishes as a companion, the escort must accompany whomever the employer selects. Escorts and their clients do not claim to be involved in procreation, raising and educating children, cohabitation with relatives, or the other activities of family life. An escort may be involved with a large number of clients. While we may assume that the relationship between them is cordial and that they share conversation, companionship, and the other activities of leisure, we do not believe that a day, an evening, or even a weekend is sufficient time to develop deep attachments or commitments. In fact, the relationship between a client and his or her paid companion may well be the antithesis of the highly personal bonds protected by the fourteenth amendment. These are not the ties that "have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." 468 U.S. at 618-19, 104 S.Ct. at 3250.
 
 
 29
 We conclude that the county's regulation does not reach such a substantial amount of conduct protected by the freedom of intimate association to permit a facial challenge, and to that extent the escort services' reliance on Wilson is misplaced.[5]
 
 B. Expressive Association
 
 30
 The freedom of expressive association permits groups to engage in the same activities that individuals may engage in under the first amendment.
 
 
 31
 An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.
 
 
 32
 Roberts, 468 U.S. at 622, 104 S.Ct. at 3252 (citations omitted). Dating and other social activities are worthy of some protection under the first amendment even though these activities may lack an overt political, religious, or educational purpose. We do not limit protection to words that are "strident, contentious, or divisive," but extend it to "quiet persuasion, inculcation of traditional values, instruction of the young, and community service." Id. at 636, 104 SCt. at 3259 (O'Connor, J., concurring in part and concurring in the judgment). "Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). We conclude that dating and other social associations to the extent that they are expressive are not excluded from the safeguards of the first amendment.
 
 
 33
 Our analysis cannot stop here, for we must decide the extent to which the activities of the escort services are entitled to these protections. While the first amendment fully protects expression about philosophical, social, artistic, economic, literary, ethical, and other topics, Abood, 431 U.S. at 231, 97 S.Ct. at 1797, it does not protect every communication or every association that touches these topics. The escort services contend that their escorts and clientele associate for social, economic, and cultural ends, but have never disclosed the type of expression that they fear may be chilled. Legislatures, in regulating commercial activity, have severely limited the freedoms of speech and association:
 
 
 34
 Moreover, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 [69 S.Ct. 684, 691, 93 L.Ed. 834] (1949). Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (CA2 1968), cert. denied, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969), corporate proxy statements, Mills v. Electric Auto-Lite Co., 396 U.S. 375, [90 S.Ct. 616, 24 L.Ed.2d 593] (1970), the exchange of price and production information among competitors, American Column & Lumber Co. v. United States, 257 U.S. 377, [42 S.Ct. 114, 66 L.Ed. 284] (1921), and employers' threats of retaliation for the labor activities of employees, NLRB v. Gissel Packing Co., 395 U.S. 575, 618, [89 S.Ct. 1918, 1942, 23 L.Ed.2d 547] (1969). See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61-62 [93 S.Ct. 2628, 2637, 37 L.Ed.2d 446] (1973). Each of these examples illustrates that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.
 
 
 35
 Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456-57, 98 S.Ct. 1912, 1918-19, 56 L.Ed.2d 444 (1978). The county argues that the escort services are not involved in protected expression and may be regulated to the same extent as any purely commercial activity. The escort services vigorously contest the assertion that their first amendment rights are less worthy of protection because their activities are commercial. They compare themselves with publishers and purveyors of books and newspapers, concert promoters, cable television franchisers, and owners of topless bars. Those organizations' claim on the first amendment is not diminished by their sale of expression. See First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 787, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 386, 93 S.Ct. 2553, 2559, 37 L.Ed.2d 669 (1973); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 64 & n. 6, 83 S.Ct. 631, 636 & n. 6, 9 L.Ed.2d 584 (1963); Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1058-60 (9th Cir.1986); Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396, 1410 n. 10 (9th Cir.1985); Gannett Satellite Information Network, Inc. v. Metropolitan Transp. Auth., 745 F.2d 767, 772 (2d Cir.1984); Cinevision Corp. v. City of Burbank, 745 F.2d 560, 567 (9th Cir.1984), cert. denied, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). The escort services urge that they are entitled to the same protection in the sale of companionship.
 
 
 36
 We readily concede that distinguishing between associations that are primarily expressive and those that are primarily commercial will not always be easy. Justice O'Connor, writing separately in Roberts, suggested that the courts can make this distinction by examining an association's activities and purposes:
 
 
 37
 Many associations cannot readily be described as purely expressive or purely commercial. No association is likely ever to be exclusively engaged in expressive activities, if only because it will collect dues from its members or purchase printing materials or rent lecture halls or serve coffee and cakes at its meetings. And innumerable commercial associations also engage in some incidental protected speech or advocacy. The standard for deciding just how much of an association's involvement in commercial activity is enough to suspend the association's First Amendment right to control its membership cannot, therefore, be articulated with simple precision....
 
 
 38
 In my view, an association should be characterized as commercial, and therefore subject to rationally related state regulation of its membership and other associational activities, when, and only when, the association's activities are not predominantly of the type protected by the First Amendment.
 
 
 39
 Roberts, 468 U.S. at 635, 104 S.Ct. at 3259 (O'Connor, J., concurring in part and concurring in the judgment).
 
 
 40
 Under any test it is clear that the escort services are primarily commercial enterprises, and their activities are not predominantly of the type protected by the first amendment. Despite its superficial appeal, the escort services' attempt to analogize themselves to newspaper publishers does not withstand scrutiny. First, both speech and the press are explicitly mentioned in the first amendment; escort services and dating are not. Second, books and newspapers are, without doubt, expression; dating is conduct that is protected to the extent that it involves expressive activities. See Roberts, 468 U.S. at 622, 104 S.Ct. at 3252; see also United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) ("when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"). A couple out on the town is not an overtly expressive association when compared to political parties, civil rights organizations, publishers, churches, lobbyists, labor unions, and other special interest groups.
 
 
 41
 Third, and most important, the escort services make no claim that expression is a significant or necessary component of their activities. The services' advertisements included in the record do not tout their employees' skills in conversation, advocacy, teaching, or community service, and thus we assume that clients select their companions on the basis of other criteria.[6] Unlike publishers, concert promoters, and cable television franchisers, the escort services do not control the content of expression or ensure that any expression occurs. They exercise no editorial judgment over the messages their employees convey and do not insist that they convey any. See Preferred Communications, 754 F.2d at 1410 n. 10 (selection of which views to present is a component of expression protected by the first amendment). If a client does not care to engage in expressive activities while dating, we must assume that neither the escort services nor the escort compel the client to do so. The escort services simply do not care what the couples talk about or whether they talk at all. The escort services cannot claim that expression constitutes anything but an incidental aspect of their commercial activity.
 
 IV. The Escort Services' Facial Challenge
 
 42
 We conclude that the Constitution may afford some protection to dating and other social groups because of their value as intimate and expressive associations. The escort services, however, have little claim on the protections afforded intimate associations because the relationship between an escort and client possesses almost none of the constitutional aspects of intimate associations. They also lack a substantial claim to the protections given expressive associations because the escort services' activities and purposes are primarily commercial rather than communicative. As the county's regulation does not reach a substantial amount of constitutionally protected conduct, the escort services' facial challenge alleging an impermissible burden on their rights cannot succeed.
 
 A. Prior Restraint and Overbreadth
 
 43
 The requirement of obtaining a license does not operate as a prior restraint on expression. As the activities of the escort services and their employees do not implicate substantial first amendment rights, the county may exercise some discretion in granting licenses. If the county revokes or denies licenses for arbitrary or constitutionally suspect reasons, the aggrieved party may challenge the application of the regulation in that specific context.[7] We note that the county granted these plaintiffs licenses and therefore they may lack standing to challenge the licensing requirements as it applies to them. In any event, the fact that they have licenses militates against facial invalidation of the regulation. The regulation's time, place, and manner restrictions on the operation of escort services are valid.[8]
 
 
 44
 The plaintiffs' attack for overbreadth also fails. The regulation's bounds are sufficiently clear that there is no substantial instrusion on noncommercial social associations. Flipside, 455 U.S. at 494-96, 102 S.Ct. at 1191-92; Broadrick, 413 U.S. at 615, 93 S.Ct. at 2917.[9] To the extent that the escort services' challenge for overbreadth asserts the rights of other business associations involved in significant amounts of expressive activities, it fails because such a challenge cannot be made in a commercial context. See Bates v. State Bar of Arizona, 433 U.S. 350, 380-81, 97 S.Ct. 2691, 2707-08, 53 L.Ed.2d 810 (1977). The justification for this limitation on attacks for overbreadth is not based on the assumption that all expression emanating from commercial associations is commercial speech: such an assumption is incorrect. See Virginia Pharmacy, 425 U.S. at 761-62, 96 S.Ct. at 1825-26. Instead, it is justified because commercial entities are less likely to require an outsider to champion their first amendment rights. Bates, 433 U.S. at 380-81, 97 S.Ct. at 2707-08; Virginia Pharmacy, 425 U.S. at 771-72 & n. 24, 96 S.Ct. at 1830-31 & n. 24. Accordingly, the escort services may not assert the rights of other commercial associations.[10]
 
 B. Vagueness
 
 45
 Our conclusion that the escort services' activities are not protected by the first amendment is not fatal to all claims that the county's regulation is void for vagueness. See Flipside, 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7. Regardless of whether a statute impinges on other constitutional rights, due process requires it to give adequate notice of what conduct is prohibited and sufficient guidelines to prevent arbitrary and discriminatory enforcement. See Grayned, 408 U.S. at 108-09, 92 S.Ct. at 2298-99. The absence of a significant first amendment interest is, however, fatal to a facial challenge of a business regulation for vagueness unless the regulation is vague in all possible applications. Kolender, 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8; Flipside, 455 U.S. at 497, 102 S.Ct. at 1193. A statute that imposes criminal penalties must be more precise than one that regulates business behavior. Kolender, 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8. The regulation's only criminal penalty is for operation of an escort service without a license. Nev.Rev.Stat. Sec. 244.345(7) (1985); see Republic Entertainment, 99 Nev. at 817, 672 P.2d at 638. All the plaintiffs applied for and received licenses: they cannot not now claim that the regulation is so vague that it provides inadequate notice to them of their need for licenses.
 
 
 46
 The regulation prohibits escort services from operating in a "sexually oriented" manner or advertising in a manner that suggests to a "reasonable, prudent person that sexual stimulation or sexual gratification" will be provided. CCC Secs. 8.32.080(I), 8.32.120, 8.32.140. The escort services argue that the terms "sexually oriented," "sexual stimulation," and "sexual gratification" are so vague that the regulation invites arbitrary and discriminatory enforcement. These terms are narrowly defined in the regulation. See supra notes 1-2. The only possible exception is the inclusion of the phrase "to excite or arouse the prurient interest" in the definition of sexual stimulation. The Supreme Court made it clear in Spokane Arcades, 472 U.S. at 504-06, 105 S.Ct. at 2802-03, that use of such terms as "lust" or "prurient" does not justify facial invalidation of an entire statute: the terms can be defined so as to pass "constitutional muster" and courts should assume they will be so defined absent clear evidence to the contrary. Id. at 504-07 & n. 13, 105 S.Ct. at 2802-04 & n. 13; see Polykoff v. Collins, 816 F.2d 1326, 1334-37 (9th Cir.1987).
 
 CONCLUSION
 
 47
 The county's regulation governing the licensing and operation of escort services neither reaches a substantial amount of activity protected by the freedom of expressive association nor appears vague in all possible applications. Therefore, the escort service's facial challenge fails. We emphasize that our holding does not mean that the regulation is incapable of unconstitutional application in particular situations and does not immunize the regulation from challenges to its application. Facial invalidation is "strong medicine" which should be used "sparingly and only as a last resort." Broadrick, 413 U.S. at 613, 93 S.Ct. at 2916. We conclude that this regulation does not reach a sufficient amount of the activities protected by the Constitution to justify a dose of that medicine.
 
 
 48
 AFFIRMED.
 
 REINHARDT, Circuit Judge, dissenting:
 
 49
 I dissent. I would invalidate the Clark County licensing regulation on constitutional grounds.
 
 
 50
 The regulation makes it unlawful to operate an escort bureau without a license or to work as an escort unless employed by a licensed bureau. Clark County Code (CCC) Secs. 8.32.040, 8.32.050 (1985). However, licenses are not issued automatically. Rather, the licensing officials are granted broad discretion to deny, suspend, and revoke licenses. Id. Secs. 8.32.080(I-J), 8.32.140. For example, the licensing board can deny an application if the applicant is not a person "of good character, honesty and integrity," id. Sec. 8.32.080(I)(1), or if the applicant or his or her source of financing is not "suitable," id. Secs. 8.32.080(J)(1), 8.32.080(I)(3). The regulation defines "escort" as anyone "who is held out to the public to be available for hire" and who, for monetary consideration, "consort[s] with, or accompanies ... another or others to or about social affairs, entertainments or places of amusement or within any place of public resort or within any private quarters." Id. Sec. 8.32.060(A).[1]
 
 
 51
 I believe that the licensing scheme, because it is targeted directly at people's ability to associate with one another, regulates constitutional freedom of association and should therefore be carefully scrutinized. Applying traditional first amendment principles, I conclude that the regulation is vague and overbroad and does not constitute the least restrictive means of promoting the county's interests.
 
 I. APPLICABILITY OF THE FIRST AMENDMENT
 
 52
 It is well established that freedom of association is an "inseparable aspect" of the freedom of speech protected by the first amendment and the liberty protected by the due process clause of the fourteenth amendment. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). Moreover, "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters." Id. The protection of the Constitution extends to association for social as well as political ends. See, e.g., Coates v. City of Cincinnati, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971) (referring to "the right of the people to gather in public places for social or political purposes").
 
 
 53
 The Supreme Court has said that constitutionally protected freedom of association has two categories. Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984). The first is "freedom of intimate association," which is coextensive with the right of privacy. Id. at 618, 104 S.Ct. at 3250; see Fleisher v. City of Signal Hill, 829 F.2d 1491, 1499-1500 (9th Cir.1987). The second is "freedom of expressive association," which is implicit in the first amendment's guarantees. Jaycees, 468 U.S. at 618, 622, 104 S.Ct. at 3252.
 
 
 54
 It is in its construction of Jaycees that the majority makes its principal error. The majority bases its analysis of IDK's constitutional rights on the views expressed by Justice O'Connor in her concurring opinion. In that opinion, Justice O'Connor argued that association should lose its first amendment protection if it is primarily commercial in nature. See Jaycees, 468 U.S. at 635, 104 S.Ct. at 3259 (O'Connor, J., concurring in part and concurring in the judgment); majority at 1193. The majority applies Justice O'Connor's test to the escort services and concludes that "the escort services are primarily commercial enterprises, and their activities are not predominately of the type protected by the first amendment." Majority at 1195.
 
 
 55
 Contrary to the majority's assumption, the Supreme Court has never adopted the primarily expressive/primarily commercial distinction; nor has the Court ever said that an association must be primarily expressive in order to be constitutionally protected. However appealing this approach may seem at first blush, it is not the route the Court took in Jaycees and it is not one we should take here.
 
 
 56
 Justice O'Connor acknowledged the difficulties inherent in her proposed standard, see Jaycees, 468 U.S. at 635-37, 104 S.Ct. at 3259-60 (O'Connor, J., concurring in part and concurring in the judgment), and her discussion only serves to highlight the dangers of her analysis. She seems to look to the purpose of the activity in question, distinguishing for example between "[l]awyering to advance social goals" and "[lawyering] for commercial ends." Id. at 636-37, 104 S.Ct. at 3259-60. But her focus on motive bears no relation to the goals the first amendment is designed to serve, and her dichotomy between expressive activity and commercial activity is, in my view, a false one. Many of the activities we consider at the heart of the first amendment are undertaken for purely commercial ends, but that fact is not dispositive in the constitutional analysis. Where activity is protected by the first amendment, the fact that it also has a commercial aspect does not and should not deprive the activity of its usual protection or reduce the degree of scrutiny required. See First National Bank of Boston v. Bellotti, 435 U.S. 765, 786 n. 23, 98 S.Ct. 1407, 1421 n. 23, 55 L.Ed.2d 707 (1978); New York Times Co. v. Sullivan, 376 U.S. 254, 265-66, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). The fact that IDK's judgment--like that of the New York Times or of Playboy magazine--is "tempered by commercial considerations" does not affect its first amendment rights or those of the escorts or their patrons. See Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396, 1410 n. 10 (9th Cir.1985). To analyze the issue in terms of the expressive/commercial dichotomy thus invites the placing of serious limitations on heretofore protected first amendment rights.
 
 
 57
 Theater owners, booksellers, and concert promoters provide products to the public in exchange for monetary compensation. They are protected by the first amendment because the materials or activities they make available are protected. See Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396 (9th Cir.1985); Cinevision Corp. v. City of Burbank, 745 F.2d 560 (9th Cir.1984), cert. denied, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985). The fact that they are commercial operators is of no constitutional significance.[2] IDK acts to facilitate association between individuals. To the extent that association is constitutionally protected, the first amendment applies to IDK (as well as to the escorts and their patrons), despite the fact that IDK operates for commercial ends.[3]
 
 
 58
 It may be that the majority is confusing the category of those who have a commercial interest in protected activity with the category of "commercial speech." See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 2890-91 n. 11, 69 L.Ed.2d 800 (1981). But the commercial speech that the Supreme Court has held deserving of a lesser degree of first amendment protection is not speech that is bought and sold; rather, it is speech that "does 'no more than propose a commercial transaction.' " Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986) (quoting Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976)). The primary example is pure commercial advertising. See, e.g., Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (advertising by attorneys); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (advertising by pharmacists). The commercial speech cases that the majority cites simply have no bearing on this case. See Chase v. Davelaar, 645 F.2d 735, 738 (9th Cir.1981) (like books, newspapers, and movies, topless dancing is not commercial speech even though it is "a form of expression presented for pecuniary gain").[4]
 
 
 59
 While I believe that the escort-patron relationship is protected by the first amendment by virtue of the right of expressive association, I also believe that it is constitutionally protected because it involves important elements of both expressive and intimate association. In prior cases, the Supreme Court has found that protected associations fell into one or the other category. See Jaycees, 468 U.S. at 618-20, 104 S.Ct. at 3249-51; see also Board of Directors of Rotary International v. Rotary Club of Duarte, --- U.S. ----, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). I do not believe, however, that the Court intended to exclude from constitutional protection associations that combine elements from both categories. Relationships between people may be intensely personal without rising to the level of the "deep attachments and commitments to the necessarily few other individuals with whom one shares ... distinctively personal aspects of one's life." Jaycees, 468 U.S. at 620, 104 S.Ct. at 3250. Those same relationships may also give rise to first amendment concerns, in that they help formulate individuals' political, religious, and cultural identities, without being directed explicitly or exclusively toward first amendment ends. Associations between two individuals often involve both a personal or intimate aspect and the exchange of views and ideas. It would make little sense to exclude such associations from constitutional protection simply because they do not fall clearly into either the intimate or the expressive category. The right of two individuals to choose to associate together for reasons short of marriage is, I believe, deserving of full constitutional protection. Nevertheless, for purposes of the remainder of the dissent, I will rely exclusively on the expressive association category.[5]
 
 
 60
 II. FAILURE TO MEET FIRST AMENDMENT STANDARDS
 
 
 61
 The Clark County regulation is not a routine business licensing provision. Under a routine licensing scheme, the escort services might be required to submit certain information and perhaps pay a fee, and would then receive licenses automatically. Such licensing requirements have been upheld even where they apply to first amendment activities. For example, we recently upheld an ordinance that required erotic dancers and operators of erotic dance studios to obtain licenses. Kev, Inc. v. Kitsap County, 793 F.2d 1053 (9th Cir.1986). Under that ordinance, applicants were required to submit certain information, but they then received licenses automatically; the county had no discretion to refuse to issue the licenses. Id. at 1060. We noted that "there is no suggestion that the licenses ... would be difficult to obtain or would for some other reason discourage" protected expression. Id. We therefore treated the licensing requirement as a time, place, and manner regulation; such regulations are permissible " 'so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.' " Id. at 1058 (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986)).[6]
 
 
 62
 The Clark County regulation imposes a significantly greater restriction on the exercise of first amendment rights than did the ordinance we upheld in Kev. Clark County puts the burden on the applicant to prove that he or she is deserving of a license, and gives the licensing officials broad discretion to grant or withhold permission to associate based on a number of subjective factors. Thus the licensing scheme is not simply a restriction on the time, place, and manner in which the escort services do business. To the contrary, the escort services cannot do business at all unless the state, in the exercise of its discretion, allows them to do so. Although the regulation does not ban protected activity outright, it clearly "inhibits the ability or the inclination to engage" in such activity. Kev, 793 F.2d at 1060.
 
 
 63
 Accordingly, the Clark County regulation must meet stricter standards than the regulations at issue in Kev and in the zoning cases. Restrictions on the right of expressive association (other than time, place, and manner restrictions) are impermissible unless inter alia they are drawn narrowly and with specificity and constitute the least restrictive means of advancing the state's interests. The Clark County licensing scheme meets none of these requirements.
 
 A. Arbitrary and Discriminatory Enforcement
 
 64
 A discretionary licensing provision, under which the licensing authority decides whether protected activity may or may not be carried on, raises the danger of arbitrary and discriminatory enforcement. See Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). For this reason, such a provision must inter alia meet a very high standard of specificity. Where a first amendment right is implicated, as it is here, we must ensure that the regulation under challenge has been carefully drafted and that it provides adequate standards to guide law enforcement. Kolender v. Lawson, 461 U.S. 352, 357-58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).[7]
 
 
 65
 In several cases, the Supreme Court has overturned ordinances that required licenses or permits for the exercise of first amendment rights because of the danger of arbitrary enforcement. For example, in Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Court reversed a conviction under a local ordinance requiring a permit for any parade, procession, or public demonstration and giving city officials broad discretion to grant or withhold such permits. The Court held that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Id. at 150-51, 89 S.Ct. at 938 (footnote omitted); see also Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) (reversing conviction under city ordinance requiring permit to solicit membership for any organization or union that collected dues); Schneider v. New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (reversing conviction under city ordinance requiring permit to canvass or distribute handbills).
 
 
 66
 The Clark County regulation fails to meet the standard of specificity that the first amendment demands. It requires that licenses be obtained for the exercise of associational rights, yet it allows the licensing officials to deny, suspend, and revoke licenses on subjective and indefinite grounds. For example, the licensing board may deny any application if the applicant is not a person "of good character, honesty and integrity," CCC Sec. 8.32.080(I)(1); if the applicant's prior activities, reputation, habits, or associations "pose a threat to the public interest of the county," id. Sec. 8.32.080(I)(2); if the escort service's source of financing is not "suitable," id. Sec. 8.32.080(J)(1); if "unsuitable persons" are or will be involved in the escort service's day-to-day operations or have a financial interest in the service, id. Secs. 8.32.080(J)(9-10); if the applicant is not "[i]n all other respects qualified to be licensed" or is not "found suitable consistently with the declared policy of this chapter," id. Sec. 8.32.080(I)(3); or for "any cause deemed reasonable," id. Sec. 8.32.080(J)(11). A license may also be suspended or revoked if the licensee or any of its partners, managers, or employees has "[c]onducted or maintained the business in a manner contrary to the peace, safety, general welfare or morals of the community." Id. Sec. 8.32.140(j).
 
 
 67
 Such criteria are acceptable where the activity being licensed is not constitutionally protected. See, e.g., Jacobson v. Hannifin, 627 F.2d 177 (9th Cir.1980) (upholding Nevada gaming statute granting Gaming Commission wide discretion in licensing). Here, however, the regulation vests in the licensing board the discretion to allow or disallow protected association. In the present context, the use of words like "suitable," "threat to the public interest," and "morals of the community" raises the possibility that the licensing officials will enforce the law arbitrarily or in such a way as to require others to "comport themselves according to the life style deemed appropriate" by those in authority. Papachristou v. City of Jacksonville, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972) (overturning vagrancy ordinance on vagueness grounds); see Coates, 402 U.S. at 616, 91 S.Ct. at 1689 (prohibition against "annoying" associations invited discriminatory enforcement against those whose ideas or lifestyle were unpopular). The freedom to engage in protected association, like the freedom to hold a public demonstration or to distribute handbills, cannot be made dependent on such uncontrolled discretion.
 
 B. Least Restrictive Means
 
 68
 Because the Clark County regulation affects associational rights, it must also meet the standard spelled out by the Supreme Court in Jaycees: "Infringements on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." 468 U.S. at 623, 104 S.Ct. at 3252. The escort service licensing scheme fails to meet the third prong of this standard.
 
 
 69
 In applying the Jaycees test, we look first to the interests that the county has asserted as justification for the regulation. Those interests fall into three broad categories: "the health and safety of the public, community, and tourists"; public morality and decency; and economic development. CCC Sec. 8.32.010(C). The first is threatened by the dangers of infectious disease, see id. Sec. 8.32.010(C)(d), violence to the escorts, see id. Sec. 8.32.010(C)(m), and fraud against the patrons, see id. Secs. 8.32.010(C)(a, b, i, j). The second is implicated because the county believes the escort services are primarily prostitution operations. Id. Sec. 8.32.010(C)(o). The third is affected because the escort services are "harmful to the cause of attracting tourists, visitors, and conventions to the county." Id. Sec. 8.32.010(C). These interests are unrelated to the suppression of ideas, and they may all be regarded as compelling.
 
 
 70
 However, the Clark County regulation fails to satisfy the final element of the Jaycees test, because it is readily apparent that there are means of achieving the county's goals that are "significantly less restrictive of associational freedoms." Jaycees, 468 U.S. at 623, 104 S.Ct. at 3252. Indeed, most, if not all, of the evils that the county associates with escort bureaus can be (or have already been) addressed by criminal statutes targeted directly at the evils themselves. If the county is seeking to halt prostitution, it has already taken the least restrictive means of achieving that goal: it has outlawed prostitution. The other problems that the county ascribes to escort services can be relieved more directly and less harmfully by enacting, amending, and enforcing laws against fraud, coercion, extortion, and pandering. The county admits that laws already exist requiring weekly health examinations for infectious disease, see CCC Sec. 8.32.010(C)(d), and requiring escort services that act as employment agencies to obtain licenses, see id. Sec. 8.32.010(C)(g). Other concerns might be addressed by requiring the escort services to provide protection for their employees and by legitimate time, place, and manner restrictions. For example, Clark County might eliminate the licensing scheme or make the issuance of licenses automatic, and simply require all escort services to maintain open offices or prohibit the use of "runners." See, e.g., Kev, 793 F.2d at 1061-62.[8]
 
 
 71
 In overturning other ordinances that prohibited or imposed a licensing requirement on the exercise of first amendment rights, the Supreme Court similarly required that the least intrusive means of achieving state interests be adopted. In Schneider, for example, the Court noted that licensing the distribution of handbills was not the most direct way of controlling fraudulent solicitations for charity:
 
 
 72
 Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.
 
 
 73
 308 U.S. at 164, 60 S.Ct. at 152. Where prevention of littering was the goal, the Court observed: "There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." Id. at 162, 60 S.Ct. at 151; see City of Houston v. Hill, --- U.S. ----, 107 S.Ct. 2502, 2510 n. 11, 96 L.Ed.2d 398 (1987) (invalidating ordinance making it unlawful to interrupt a police officer in the performance of his or her duties, suggesting that such an offense "might constitutionally be punished under a tailored statute that forbade individuals from physically obstructing an officer's investigation" rather than "a broad statute aimed at speech"); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980) (striking down ordinance prohibiting solicitation by charities that spend more than 25% of receipts on salaries and administrative expenses, noting that prohibition of fraudulent misrepresentation was less intrusive means of achieving same goal); United States v. Robel, 389 U.S. 258, 267, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1967) (striking down statute limiting employment of members of Communist groups at defense facilities, commenting that "Congress can, of course, prescribe criminal penalties for those who engage in espionage and sabotage"); see also Posadas de Puerto Rico, 106 S.Ct. at 2985 (Brennan, J., dissenting) (Puerto Rico could directly address the harms associated with casino gambling rather than prohibiting constitutionally protected advertising).
 
 
 74
 The comprehensive, discretionary licensing scheme that Clark County has adopted is not the least restrictive means available to achieve its ends. It is therefore constitutionally impermissible.
 
 C. Overbreadth
 
 75
 In assessing an overbreadth challenge, the courts must look to "the ambiguous as well as the unambiguous scope" of the regulation; in this respect, "the vagueness of a law affects overbreadth analysis." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982). A previous version of the Clark County regulation, which prohibited working as an escort, was struck down by the Nevada Supreme Court as impermissibly vague because it failed to give adequate notice of what conduct was forbidden: "For example, persons functioning as social secretaries--as companions to the aged, lonely or infirm--or even as babysitters, arguably might be guilty of impermissible conduct." Eaves v. Board of Clark County Commissioners, 96 Nev. 921, 924, 620 P.2d 1248, 1250 (1980). The regulation was subsequently revised to license rather than prohibit escort activities and to refine the definition of "escort." The current regulation also exempts from the escort licensing requirement businesses that are otherwise licensed by the state or county and that "perform an escort or escort bureau function as a service merely incidental to [their] primary function." CCC Sec. 8.32.150.[9]
 
 
 76
 Nevertheless, it is not clear that the amendments have resolved the ambiguities cited in Eaves. Babysitters, companions, and social secretaries may all fall into the category of persons held out to the public as available for hire and paid to accompany others to social affairs, places of amusement, or public resorts. These individuals are not required to obtain licenses under state law.[10] Moreover, for a paid companion or social secretary, the "escort function" is the primary focus of employment.[11] Thus the post-Eaves amendments do not appear to have removed these individuals from the Clark County regulation's scope.
 
 
 77
 However, Clark County has offered no justification at all for licensing these associations. Its licensing scheme affects all first amendment associations in which one person is paid to associate with another, regardless of whether the association creates any of the harms that the county seeks to prevent. In this regard, the Clark County regulation differs significantly from the zoning ordinances targeted at adult establishments which the Supreme Court upheld in City of Renton and Young. The zoning regulations were carefully limited to the particular type of expressive activity that was thought to create problems: the exhibition of adult films.[12] See Young, 427 U.S. at 82, 96 S.Ct. at 2458 (Powell, J., concurring) ("The case would present a different situation had Detroit brought within the ordinance types of theaters that had not been shown to contribute to the deterioration of surrounding areas.").
 
 
 78
 In contrast, the Clark County licensing scheme is not limited to particular harms or to particular types of association that are linked with those harms; in fact, businesses that promote the objectionable type of association--sexually oriented escort bureaus--cannot be licensed at all. The regulation governs all associations in which one party receives monetary compensation. But the payment of money is not the evil with which the county is concerned, and that single criterion is not so closely linked to the harms cited by the county as to justify the regulation of protected association. The county cannot require that all paid-for protected association be licensed just because one type of paid-for association may give rise to problems or difficulties. See Board of Airport Commissioners v. Jews for Jesus, Inc., --- U.S. ----, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (invalidating resolution prohibiting all first amendment activity in Los Angeles airport, noting that the resolution banned all protected expression rather than "merely regulat[ing] expressive activity ... that might create problems"); Coates, 402 U.S. at 614, 91 S.Ct. at 1688 (although ordinance prohibiting "annoying" associations was "broad enough to encompass many types of conduct clearly within the city's constitutional power to prohibit," it should have been directed specifically toward such conduct); Chase, 645 F.2d at 738-39 (invalidating ordinance restricting topless dancing on ground of overbreadth).
 
 
 79
 "Precision of regulation must be the touchstone" where first amendment rights are concerned. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). Yet the Clark County regulation reaches protected associations that are completely unrelated to the interests the county is seeking to advance. Again, this violates constitutional standards. See Hoffman Estates, 455 U.S. at 494-95, 102 S.Ct. at 1191-92.
 
 CONCLUSION
 
 80
 The Clark County regulation requires that licenses be obtained for the exercise of first amendment associational rights, and gives licensing officials broad discretion to grant or withhold such licenses. However, it fails to meet the strict standards that the first amendment imposes. It is written in terms that invite arbitrary and discriminatory enforcement. It is not the least restrictive means of achieving the county's goals, and it encompasses associations that are unrelated to those goals. It is "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." Coates, 402 U.S. at 614, 91 S.Ct. at 1688. For these reasons, I respectfully dissent from the majority's decision.
 
 
 
 [1]
 (A) An "escort" is a person who is held out to the public to be available for hire and who for monetary consideration in the form of a fee, commission, salary, to consort with, or accompanies or who offers, for monetary consideration, to consort, or accompany, another or others to or about social affairs, entertainments or places of amusement or within any place of public resort or within any private quarters
 (1) A "service oriented escort" is an escort which:
 (a) Operates from an open office; and
 (b) Does not employ or use an escort runner; and
 (c) Does not advertise that sexual conduct will be provided to the patron or work for an escort bureau which so advertises; and
 (d) Does not offer or provide sexual conduct.
 (2) A "sexually oriented escort" is an escort which:
 (a) Employs as an employee, agent or independent contractor an escort bureau runner; or
 (b) Works for, as an agent, employee, contractor, or is referred to a patron by a sexually oriented escort bureau; or
 (c) Advertises, that sexual conduct will be provided, or works for, as an employee, agent or independent contractor or is referred to a patron by an escort bureau which so advertises; or
 (d) Solicits, offers to provide or does provide acts of sexual conduct to an escort patron, or accepts an offer or solicitation to provide acts of sexual conduct for a fee in addition to the fee charged by the escort bureau; or
 (e) Works as an escort without having a current work identification card issued for the referring escort bureau in his or her possession at all times while working as an escort; or
 (f) Accepts a fee from a patron who has not first been delivered a contract.
 (B) An "escort bureau" is a person, as defined herein, which for a fee, commission, profit, payment or other monetary consideration, furnishes, refers or offers to furnish or refer escorts, or provides or offers to introduce patrons to escorts.
 (1) A "service oriented escort bureau" is an escort bureau which:
 (a) Maintains an open office at an established place of business; and
 (b) Employs or provides only escorts which possess work identification cards; and
 (c) Does not use an escort bureau runner; and
 (d) Does not advertise that sexual conduct will be provided to a patron.
 (2) A "sexually oriented escort bureau" is an escort bureau which:
 (a) Operates in any of the manners described in Section 8.32.010(C)(a), (b), (e), (k), (o); or
 (b) Does not maintain an open office; or
 (c) Employs as an employee, agent or independent contractor, uses an escort bureau runner; or
 (d) Advertises, that sexual conduct will be provided, or that escorts which provide such sexual conduct will be provided, referred, or introduced to a patron; or
 (e) Solicits, offers to provide or does provide acts of sexual conduct to an escort patron; or
 (f) Employs, contracts with or provides or refers escorts who do not possess work identification cards as required herein and in Chapter 8.24 of the Clark County Code; or
 (g) Does not deliver contracts to every patron or customer; or
 (h) Employs, contracts with a sexually oriented escort or refers or provides to a patron, a sexually oriented escort.
 CCC Sec. 8.32.060(A)-(B).
 
 
 [2]
 (Q) "Sexual stimulation" means to excite or arouse the prurient interest or to offer or solicit acts of sexual conduct as defined under "offer to provide acts of sexual conduct" in subsection (G) of this section
 (R) "Sexual gratification" means sexual conduct as defined in subsection (J) of this section.
 CCC Sec. 8.32.060(Q)-(R). The regulation defines "offer to provide acts of sexual conduct" in CCC Sec. 8.32.060(G):
 (G) An "offer to provide acts of sexual conduct" means to offer, propose or to solicit to provide sexual conduct to a patron. Such definition includes all conversations, advertisements and acts which would lead a reasonably prudent person to conclude that such acts were to be provided.
 Subsection 8.32.060(J) defines "sexual conduct":
 (J) "Sexual conduct" means the engaging in or the commission of an act of sexual intercourse, oral-genital contact, or the touching of the sexual organs, pubic region, buttock or female breast of a person for the purpose of arousing or gratifying the sexual desire of another person.
 
 
 [3]
 A district court, faced with almost identical facts, held that the police officer had no constitutional right under the first or fourteenth amendment to date someone against his department's orders. Baron v. Meloni, 602 F.Supp. 614 (W.D.N.Y.1985), aff'd without opinion, 779 F.2d 36 (2d Cir.), cert. denied, 474 U.S. 1058, 106 S.Ct. 798, 88 L.Ed.2d 775 (1986)
 
 
 [4]
 Without relying on the doctrine of overbreadth, the escort services may assert the first amendment rights of their employees and clients as well as their own. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-57, 96 S.Ct. 1817, 1822-23, 48 L.Ed.2d 346 (1976); see Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1059 (9th Cir.1986). A claim of overbreadth may give the plaintiffs standing to assert the rights of others with absolutely no connection to the escort services. Flipside, 455 U.S. at 495-96, 102 S.Ct. at 1191-92
 
 
 [5]
 The Wilson case was not a facial attack on an ordinance but a suit under 42 U.S.C. Sec. 1983 alleging that the police department fired officer Wilson for exercising his right of association. 733 F.2d at 1540. We are uncertain whether one can facially challenge a statute on the grounds that it violates the right of intimate association. None of the decisions cited in Roberts as establishing this right, 468 U.S. at 619, 104 S.Ct. at 3250, involved such a challenge
 
 
 [6]
 In determining that the Jaycees and the Rotarians engaged in significant amounts of expressive activities, the Supreme Court examined, inter alia, the publications of these organizations. See Roberts, 468 U.S. at 612-14, 104 S.Ct. at 3246-48; Rotary Club, 107 S.Ct. at 1947. It is therefore appropriate for us to consider the advertisements and other publications of the escort services in determining whether they engage in protected expression. Our review of the advertisements of escort services included in the record indicates that clients select their escorts based on the escort's appearance, nationality, expertise in domination, 24-hour availability, and willingness to meet the client at his or her door
 
 
 [7]
 In addition to requiring detailed disclosure of financing and organization, the regulation gives the licensing board substantial discretion to grant or deny licenses:
 (I) The licensing board shall not grant the license unless it is satisfied that the applicant is suitable in all respects. The applicant must be:
 (1) A person of good character, honesty and integrity;
 (2) A person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest of the county or to the effective regulation and control of prostitution, or create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of an escort bureau or the carrying on of the business and financial arrangements incidental thereto; and
 (3) In all other respects qualified to be licensed or found suitable consistently with the declared policy of this chapter.
 (J) The license board has full power to deny any application:
 (1) If the applicant has not satisfied the licensing board that the proposed financing of the entire operation is from a suitable source; any lender or other source of money or credit which the licensing board finds does not meet the standards set forth in subsection (I) of this section may be deemed unsuitable; or
 (2) If the license application is incomplete so as to not contain all information required by this chapter; or
 (3) If all license and investigation fees are not paid; or
 (4) If the applicant or any of its principals has been convicted of a crime listed in subsection (B)(2) of this section or has been enjoined in an adjudicated civil action from engaging in fraudulent advertising or sales or trade practices; or
 (5) If the applicant, based upon his activities since the enactment of these regulations, has or has an associate who has operated a sexually oriented escort bureau; or
 (6) If the applicant, based upon the content of his application, intends to operate an escort bureau in a sexually oriented manner; or
 (7) If the applicant or partner, stockholder, officer, director or associate has had an escort license previously revoked or denied for any ground contained in this section or in Section 8.32.140; or
 (8) If the applicant, its partners, officers or directors do not qualify for or have not obtained work identification cards as required in Section 8.32.070; or
 (9) If the applicant's financial statement, business activities, background or associates disclose that unsuitable persons are or will be involved in the management or conduct of the day-to-day business affairs of the escort bureau; or
 (10) If the applicant's financial statements, business activities, background or associates disclose that unlicensed or unsuitable persons have or will have an interest in the ownership of or have an equitable or beneficial right to the profits of the escort bureau; or
 (11) For any cause deemed reasonable.
 CCC Sec. 8.32.080(I)-(J). These are also grounds for license revocation. CCC Sec. 8.32.140. The Nevada legislature has declared that escort bureaus, like casinos, are "privileged occupations." Nev.Rev.Stat. Sec. 244.345 (1981); Nev.Rev.Stat. Sec. 463.0129 p 2 (1983); CCC Sec. 8.32.080. This circuit has found that wide discretion in the issuance of gaming licenses does not violate due process. Jacobsen v. Hannifin, 627 F.2d 177 (9th Cir.1980). The county implies that because an escort bureau license is a privilege under state law, it may deny licenses for any reason whatsoever. This discretion, no matter how broad, does not permit the county to discriminate among applicants arbitrarily, capriciously, or on the basis of constitutionally suspect classifications: denying licenses on the basis of race or gender is impermissible, regardless of how Nevada categorizes occupations.
 
 
 [8]
 Escort services must, among other things, provide patrons with written contracts and receipts, operate from an office open to the public, and keep copies of all published advertisements. CCC Sec. 8.32.110
 
 
 [9]
 [T]he plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct--even if expressive--falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct
 Broadrick, 413 U.S. at 615, 93 S.Ct. at 2917.
 
 
 [10]
 The regulation exempts many businesses from its requirements:
 All professions, employments and businesses which are licensed by the state of Nevada or county of Clark pursuant to a specific statute or ordinance, and all employees employed by a business so licensed, and which perform an escort or escort bureau function as a service merely incidental to the primary function of such profession, employment or business and which do not hold themselves out to the public as an escort or escort bureau, are exempt from licensing pursuant to this chapter. Any employment agency, licensed by the state, which provides escorts as defined herein, must, however, obtain a license as required by this chapter.
 CCC Sec. 8.32.150.
 
 
 [1]
 It appears from the arguments and the record that Clark County believes that all escort services are engaged in the business of prostitution. Nevertheless, it has decided to license those services. We cannot assume that the escort services are by definition unlawful businesses, for if they were, the county could not license them. To the contrary, we must assume that the businesses that are to be licensed offer lawful association. Indeed, the regulation makes it clear that the only escort services that are entitled to licenses are those that provide lawful association. Thus we must assess the regulation in terms of its effect on lawful services and lawful association
 
 
 [2]
 It is true that commercial activity may be regulated even where constitutional freedoms are implicated. See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61-62, 93 S.Ct. 2628, 2637-38, 37 L.Ed.2d 446 (1973). The mere presence of first amendment activity does not guarantee insulation from normal business regulations; nor must such ordinary regulations withstand any judicial scrutiny stricter than rationality review just because they have an incidental impact on the exercise of constitutional rights. See Ohralik v. Ohio State Bar Association, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); see also Jaycees, 468 U.S. at 634-35, 104 S.Ct. at 3258-59 (O'Connor, J., concurring in part and concurring in the judgment). But because the Clark County licensing scheme grants wide discretion to the licensing officials, it cannot be considered simply a routine business regulation. See discussion infra
 
 
 [3]
 In support of its claim that the escort services are "primarily commercial enterprises," the majority contends that expression is not "a significant or necessary component of their activities." Majority at 1195. While in my view that contention is fallacious, I do not discuss it separately because the major premise--the expressive/commercial dichotomy--is, as I have suggested, erroneous
 
 
 [4]
 Thus the majority is wrong to declare that the escort services' overbreadth challenge "cannot be made in a commercial context." Majority at 1197. The cases hold only that overbreadth does not apply in the commercial speech context. Bates, 433 U.S. at 381, 97 S.Ct. at 2707; see also Virginia Pharmacy, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830 n. 24 ("[s]ince advertising is the sine qua non of commercial profits, there is little likelihood of its being chilled"). IDK may have a commercial interest in protected association, but that interest does not deprive IDK of the ability to assert the associational rights of others with similar interests
 
 
 [5]
 I believe, however, that the same method of analysis I apply hereafter would be applicable in a mixed-category case
 
 
 [6]
 The Supreme Court has also upheld zoning ordinances that require adult establishments to obtain licenses and satisfy locational restrictions. City of Renton; Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion). The zoning ordinances, like the routine licensing scheme in Kev, constitute time, place, and manner restrictions and are therefore subject to a more lenient constitutional standard
 
 
 [7]
 Facial challenges on grounds of vagueness or arbitrary enforcement are allowed, at least where first amendment rights are implicated. See Kolender, 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8; Schwartzmiller v. Gardner, 752 F.2d 1341, 1347 (9th Cir.1984); see also Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)
 
 
 [8]
 Of course, there is no need to decide here if these suggested restrictions would meet the appropriate constitutional standard. See City of Renton, 475 U.S. at 47, 106 S.Ct. at 928-29
 
 
 [9]
 The Nevada Supreme Court upheld the revised regulation. Republic Entertainment, Inc. v. Clark County Liquor and Gambling Licensing Board, 99 Nev. 811, 672 P.2d 634 (1983)
 
 
 [10]
 "Practical nurses" who help care for the ill, injured, or infirm are licensed, Nev.Rev.Stat. Secs. 632.010(6), 632.260-632.340 (1985), as are facilities that provide day care for the aged and infirm, id. Secs. 449.004, 449.030-449.240. However, those provisions do not appear to cover an individual who is paid to provide companionship for an elderly, bedridden, or lonely person. Child care facilities for five or more children are licensed, id. Secs. 432A.020(4), 432A.131-432A.220, but babysitters are not
 
 
 [11]
 Supervision rather than companionship would seem to be the babysitter's primary function
 
 
 [12]
 The Detroit ordinance also reached adult bookstores, as well as various businesses that did not involve protected activity. Young, 427 U.S. at 52 n. 3, 96 S.Ct. at 2444 n. 3